STATE OF HAWAII, by its Attorney General, GEORGE PAI, Plaintiff-Appellant, Cross-Appellee, *v.* ALLAN R. KUNIMOTO, JEAN KUNIMOTO, husband and wife; and GEORGE T. NEKOTA, MERLE H. NEKOTA, husband and wife, Defendants-Appellees, Cross-Appellants, and MITSUO MURAKAMI, ERNA MURAKAMI, husband and wife; SUSUMU MURAKAMI, JANET A. MURAKAMI, husband and wife, Defendants

NO. 6353

SEPTEMBER 24, 1980

RICHARDSON, C.J., OGATA, MENOR, LUM, NAKAMURA, JJ.

OPINION OF THE COURT BY LUM, J.

This is an interlocutory appeal[1] from an eminent domain action instituted by the State of Hawaii, plaintiff-appellant, against two married couples, Mr. and Mrs. Allan R. Kunimoto and Mr. and Mrs. George T. Nekota, defendants-appellees (defendants).[2] During the third day of a jury trial to determine the just compensation to be paid defendants for the taking of their property, the court sua sponte aborted the trial by declaring a mistrial. The court's action came during the State's cross-examination of defendants' appraiser. The State objected to the procedure used by defendants' appraiser to reach his fair market value opinion; it then moved to strike his testimony and his exhibit, and also moved for a directed verdict in its favor. The court denied both motions; instead, it granted the mistrial; whereupon, the State asked for this interlocutory appeal, which was granted over defendants' objection. We now face the problem of examining the trial court's rulings and the State's objection to the use of foundational data by defendants' appraiser in arriving at his market value opinion. We reverse for reasons set forth herein.

I.

Eminent domain proceedings began August 7, 1973.

The condemned property of 62,968 square feet is an unimproved parcel located in Manoa Valley. It was purchased by the defendants from the Murakamis under the following

---

[1] Defendants' motion to withdraw their cross-appeal was granted as similar issues were raised by the State's appeal.

[2] The Murakamis, who were originally named as defendants in the action when first filed by the State, filed their Disclaimer on July 18, 1975 and are no longer parties to this action.

circumstances: On April 10, 1973, the defendants and Murakamis executed a Deposit, Receipt, Offer and Acceptance (DROA) contract. The DROA provided, *inter alia,* that the defendants agree to buy and Murakamis agree to sell the subject property at a purchase price of $165,000, payable with an initial deposit of $1,000, and an additional deposit of $9,000 on May 1, 1973, a payment of $47,850 at close of escrow, and the balance by way of an agreement of sale. The DROA also set out the available remedies in case of default.[3]

The agreement of sale was thereafter executed by the defendants on August 2, 1973 and by the Murakamis on August 30, 1973.

The only other significant event and date to bear in mind is the adoption of Resolution 180 by the City Council on July 31, 1973 (before the execution of the agreement of sale), creating, defining and establishing an improvement district which provided for the extension of Woodlawn Drive through the condemned property.

The sole issue to be determined at trial was the fair market value as of August 7, 1973. For opinion evidence as to the value, the State called one expert witness as did the defendants. Both used the comparative sales method; both used the same three comparables (recent sales of neighboring properties), adjusted by substantially the same factors of time, size, shape, land use, and accessibility.

The State's expert concluded that the condemned property was worth $2.62 per square foot, or a total of $165,000, the exact price paid by defendants. To reach his conclusion, the State's expert adjusted the three comparables from their

---

[3] 7. It is expressly understood and agreed: First: In the event Buyer fails to pay the balance of the purchase price or complete the purchase as herein provided, Seller may (a) bring an action for damages for breach of contract; (b) tender a conveyance of the property to Buyer proper for recording and sue Buyer for the balance of the purchase price; or (c) retain the initial deposit, and all additional deposits provided for herein, as liquidated damages. Second: In the event Seller fails to perform his obligations as herein provided, Buyer not being in default, Buyer may (a) bring an action against Seller for damages for breach of contract; or (b) file and maintain a suit against Seller for specific performance of this contract. The foregoing shall not exclude any other remedies available to either Seller or Buyer.

agreement of sale dates to achieve a range of comparable square foot values from $2.44 to $3.16 per square foot for the property, thus assuring himself that his $2.62 per square foot value was "not out of line."

However, defendants' expert did not follow the same procedure used by the State's expert. Being familiar with real estate values, defendants' expert's initial reaction to the price paid by defendants was that it appeared low. Upon investigation, he learned that the Murakamis and defendants were old friends, having been neighbors for many years; he concluded that this relationship could have had a depressive effect upon the sale price. To test his thesis, he then compared the sale price with the same comparables used by the State, except defendants' expert adjusted the subject property from its DROA date (April 10, 1973). His comparison reflected that the average price paid for the comparable properties was $3.25 per square foot. Defendants' appraiser made a further adjustment. He included a 4% increase in value for the four-month period between the DROA date and the condemnation date, and a 30% adjustment for enhancement in value caused by Resolution 180. Considering all of these factors, he opined that the fair market value of the property was $274,500 or $4.36 per square foot.

It was during cross-examination of defendants' expert that the State felt that the adjustments made by defendants' expert to the DROA date was incompetent evidence, and that the procedure used by him to arrive at his market value opinion was misleading, speculative and highly prejudicial. It was at this point the State's motions were made and the court's declaration ensued, which resulted in this appeal.

II.

We take up the question of the procedure used by defendants' appraiser in arriving at his ultimate opinion as to the fair market value.

To place this question in its proper context, we recognize that the trial judge did not address the issue of whether evidence offered by defendants' expert as foundational data

to support his opinion, adjusted from the DROA date, was admissible. If he had done so, the obvious issue before this court would have been whether the trial court abused his discretion for we have repeatedly stated that the trial judge has broad discretionary authority to admit or exclude evidence of comparable sales and the exercise of discretion will not be upset unless there is a clear abuse of discretion. *State v. Martin,* 54 Haw. 167, 170, 504 P.2d 1223, 1225 (1973); *Honolulu Redevelopment Agency v. Pun Gun,* 49 Haw. 640, 645, 426 P.2d 324, 327 (1967); *City and County v. Bishop Trust Co.,* 48 Haw. 444, 464, 404 P.2d 373, 386 (1965); *State v. Heirs of Kapahi,* 48 Haw. 101, 112-13, 395 P.2d 932, 939 (1964).

In the absence of a failure of the trial judge to exercise discretion, we need only to determine whether the foundational data offered by the defendants' expert was admissible and whether the trial court erred in declaring a mistrial.

To do so, we need to examine defendants' substantive argument.

Defendants contend that the DROA date was critical to their expert's conclusion for a number of reasons: First, because the Murakamis and the defendants were old family friends, their expert wanted to show that the actual sale price of the condemned property was not reflective of market value at the time of sale (DROA date). To do so, he compared their sale price with the other three sales (comparables), used by the State. By comparison, the per-square-foot sale price of the subject property was considerably less than the average per-square-foot price of the comparables. The average price per square foot of the comparables was $3.25 as against the $2.62 paid by defendants. And yet the dates of sales (whether by DROA or agreement of sale) of the subject property and the comparables were actually very close in time (less than a year apart).

Defendants, therefore, contend that their expert's line of testimony was not being offered as substantive proof of value but merely as foundational support for his ultimate opinion.

Second, defendants' expert also felt that a number of other factors should be considered from and after the DROA date of the subject property.

He felt that because the condemned property had become part of an intended improvement district, approved by the Council on July 31, 1973 (before the execution of agreement of sale was completed), the value of the property had enhanced: he concluded that it had enhanced by 30%. He also concluded that for the four months between the DROA date and the agreement of sale date, a 1% per month rise in valuation should be added because prices of real estate at that time had been rising at a rate of about 12% a year.

Defendants again contend that their expert's line of testimony here fell into the arena of foundational support.

It is well established that recent sales of similar real estate are admissible as evidence in condemnation cases, either as substantive proof of value of property taken or in support of an expert's opinion as to value. If such evidence is offered on the latter basis, . . . the foundation requirements to show similarity are less strict than when the evidence is used as direct and independent proof of value. . . . *State v. Martin, supra* at 170, 504 P.2d at 1225; *State v. Dillingham Corporation,* 60 Haw. 393, 411, 591 P.2d 1049, 1060 (1979).

Any evidence which will aid the jury in fixing the fair market value of the property should be considered by them. Any competent evidence of matter, not merely speculative, which would be considered by a prospective vendor or purchaser or which tend to enhance or appreciate the value of the property taken is admissible. *Territory v. Adelmeyer,* 45 Haw. 144, 147-48, 363 P.2d 979, 982 (1961). *See also City and County v. Bishop Trust Co., supra.* It makes no difference whether the transaction occurred before or after the date of condemnation so long as it is not too remote a period of time and the land is reasonably comparable. The weight to be given such evidence is for the jury. *State v. Heirs of Kapahi, supra.*

In this jurisdiction, we have taken a liberal view toward the admission of evidence used to support an expert's opinion as to fair market value. We have reasoned that a witness, having the necessary qualifications, may give his opinion on the value of the property. The factors considered and the extent of knowledge and reasoning of an otherwise qualified

appraiser are matters which go to the weight rather than the competence of his testimony. *State v. Dillingham Corporation, supra.*

We agree with defendants' contention.

We hold that the foundational data used by defendants' expert to support his market value opinion is admissible into evidence. Any dissimilarity of an expert's data base with that of another goes to the weight and is within the province of the jury to resolve. Accordingly, we hold that the trial judge was in error in failing to uphold defendants' position.

The State argues that the use of the DROA dates was misleading, speculative, incompetent and highly prejudicial. It argues that a DROA is similar to an option. Like an option, it is based on too many contingencies, and its use as a comparable is not admissible.

Where the DROA contract binds the buyer to buy and the seller to sell a particular property at a fixed consideration, the contract is not an option, but a legally binding contract. *See Meyer v. Benko,* 55 Cal.App.3d 937, 127 Cal.Rptr. 846 (1976). We hold that the DROA contract in the instant case is not an option. We dismiss the State's argument as frivolous and without merit.

Without saying more, for reasons that are obvious, we find that the trial judge erred in declaring a mistrial and permitting an interlocutory appeal.

Reversed and remanded for proceedings in accordance with our opinion.

*Edwin P. Watson,* Deputy Attorney General, for plaintiff-appellant, cross-appellee.

*Ted T. Tsukiyama* for defendants-appellees, cross-appellants.