STATE OF HAWAII, by its Attorney General, Plaintiff-Appellant, Cross-Appellee, *v.* PIONEER MILL COMPANY, LIMITED, a Hawaii corporation; MAUI ELECTRIC COMPANY, LIMITED, a Hawaii corporation; HAWAIIAN TELEPHONE COMPANY, a Hawaii corporation; HAWAIIAN TRUST COMPANY, LIMITED, a Hawaii corporation, Trustee; BISHOP TRUST COMPANY, LIMITED, a Hawaii corporation, Trustee; KAUKAU, ADAMU KAUKAU, J. A. (Adam) KAUKAU, KAIMI MEHEULA or Their Respective Heirs, Executors, Administrators and Assigns: JOHN DOES 1 through 100, MARY ROES 1 through 100, and DOE CORPORATIONS 1 through 100, UNKNOWN OWNERS OR CLAIMANTS, Defendants-Appellees, Cross-Appellants

NO. 7532

CIVIL NO. 3063

DECEMBER 18, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

The State of Hawaii appeals from a judgment awarding Defendant Pioneer Mill Co., Ltd. (hereafter Pioneer) $734,072.75, pur-

suant to a jury verdict, in an eminent domain proceeding to acquire several parcels of land owned by Pioneer near Lahaina, Maui, for highway construction.[1] It asserts there were prejudicial errors in rulings on the admissibility of evidence and in the instructions given to the jury that resulted in an excessive and insupportable verdict. Pioneer cross-appeals, alleging the trial court erred in not awarding "post-judgment interest on blight of summons damages," in disallowing the accrual of interest during periods when trial of the case was continued at its request, and in not assessing attorneys' fees, costs, and expenses against the State. Finding no error, we affirm the judgment.

## I.

The State's suit for the acquisition of 3.966 acres of Pioneer's land situated at Honokowai, approximately four miles west of Lahaina, to effect a realignment of Honoapiilani Highway was instituted in the Circuit Court of the Second Circuit on June 17, 1976. The subject land, consistent with its classification within the agricultural district under the State Land Use Law, was then in sugar cane cultivation. For county zoning purposes, however, it had been placed in a residential zone, more particularly in an R-3 zone. It was designated for yet another possible future use, since the Maui County General Plan stipulated an apartment or hotel use for the property.

The primary issue at trial was just compensation, the contemplated public use of the taken land not being disputed. Proof of relevant value offered by the parties consisted largely of testimony elicited from land appraisers, the State's expert witness being Edward Burns and Pioneer's principal expert being Edward Hustace.

---

[1] The action filed by the State covered five parcels of land designated as Parcels 7, 7A, C-14, C-15, and C-17 on the map attached to its complaint. Parcels C-14, C-15, and C-17, however, were described as "construction parcels" required only "until such time as Plaintiff completes the . . . project." Thus, Parcels 7 and 7A are the only parcels involved in this appeal.

The complaint also named as defendants several other persons with possible interests in the condemned land. But the trial court ruled Pioneer was the sole owner of land subject to condemnation, and Pioneer is the only appellee here.

But Pioneer also offered the views of others versed in land use and development to buttress Mr. Hustace's testimony. Teney Takahashi, an officer of a property development company affiliated with the Amfac "conglomerate" of which Pioneer was a part, and Douglas Sodetani, a real estate broker who had served as Chairman of the Maui Planning Commission, were allowed to present their views on the probable future use designations of the subject property over the State's strenuous objections. Mr. Takahashi was also permitted to give an opinion relative to value.

Foreseeing the development of the land for residential purposes as a reasonable probability, the State's expert arrived at the conclusion that the market value of the land in question was $1.15 per square foot. Pioneer's principal witness, however, concluded the free market would place a value on the land of $4.50 per square foot, as he envisioned a probable future use for hotel and apartment development. And in Mr. Takahashi's opinion, $6.00 per square foot was the price that would attach to the property in the market place. The jury verdict most closely approximated the views of Pioneer's principal appraiser, as the jurors were of an opinion that $4.25 per square foot would be the fair market value of the land subject to condemnation.

## II.

We turn first to the State's appeal, where the questions for decision are:

1. Whether Pioneer's expert should have been allowed to consider certain transactions as comparable sales in arriving at an opinion on the market value of the subject land;

2. Whether testimony and other evidence, including a Maui County General Plan map, related to the reasonable probability of a redesignation of the subject property for other than agricultural or residential use should have been admitted;

3. Whether testimony on potential uses of land adjacent to the subject property should have been admitted; and

4. Whether the trial court erred in accepting certain jury instructions proposed by Pioneer and rejecting certain instructions offered by the State.

## A.

"A condemnation trial . . . [is] an ordered search for value that a free market would attach to the taken property." *City & County v. International Air Service Co.,* 63 Haw. 322, 338, 628 P.2d 192, 204 (1981). But as value is primarily a matter of opinion, we have fostered liberal rules governing "the admissibility of an expert's opinion on value and evidence purportedly supporting an expert's opinion on value in condemnation trials." *City & County v. International Air Service Co., supra,* 63 Haw. at 327, 628 P.2d at 197. We have said "[a]ny competent evidence of matter, not merely speculative, which would be considered by a prospective vendor or purchaser or which tend to enhance or appreciate the value of the property taken is admissible." *State v. Kunimoto,* 62 Haw. 502, 507, 617 P.2d 93, 97 (1980). That which is "merely speculative" is excludable, of course, since it may be "unduly confusing to the jury." *City & County v. Market Place, Ltd.,* 55 Haw. 226, 242, 517 P.2d 7, 19 (1973). And we have been reluctant to disturb a trial judge's assessment of what are indicia of speculative or "remote values, unless a clear abuse of the discretion vested in him is apparent." *City & County v. International Air Service Co., supra,* 63 Haw. at 327, 628 P.2d at 197-98; *State v. Kunimoto, supra,* 62 Haw. at 506, 617 P.2d at 97. For we are convinced his vantage point usually provides a clearer view of "the thin line that often separates competent opinion and relevant values from mere speculation and 'indicia of highly remote values' than our more distant position." *City & County v. International Air Service Co., supra,* 63 Haw. at 327, 628 P.2d at 197.

## B.

The initial assertions of prejudicial error by the State are directed at the trial court's condonation of Mr. Hustace's selection of "comparables" to derive an estimate of market value. Particular objections are raised about the appraiser's references to a transaction evidenced only by a DROA,[2] a land exchange between the

---

[2] A DROA is a standard form contract for the sale of real property in common use in Hawaii. DROA is an acronym for Deposit, Receipt, Offer and Acceptance, and the form was devised by the Hawaii Association of Realtors.

State and Pioneer, a subsequent sale by Pioneer of part of the land received in the exchange to the State, and a transaction involving land situated within the Napili Bay Civic Improvement District (NBCID). The State also objected to Mr. Hustace's resort to summaries of transactions involving hotel and apartment properties in the course of his testimony. From a review of the record, however, we cannot say there was error in the trial judge's rulings on the comparability of the transactions involved.

1.

The State attempts to beg the issue on Mr. Hustace's discussion of the transaction evidenced by a DROA when it mischaracterizes the document as an "option." A properly executed DROA "binds the buyer to buy and the seller to sell a particular property at a fixed consideration." *State v. Kunimoto, supra,* 62 Haw. at 508, 617 P.2d at 98. It is an executory contract for the sale of land and not an option. That the relevant document was executed some three years after the commencement of this proceeding is more troublesome.

. Evidence of other transactions to aid the trier of fact in determining value is generally admitted where they are sufficiently near in time, the purportedly comparable tracts are located sufficiently near the land to be valued, and these tracts and the subject property are sufficiently alike in character, situation, usability, and improvements. *City & County v. International Air Service Co., supra,* 63 Haw. at 325 n.3, 628 P.2d at 196 n.3. At first blush, a transaction three years removed from the condemnation hardly appears close enough for comparison purposes. Yet where there was an apparent paucity of comparable sales,[3] the allowance of a discussion of a transaction occurring several years after the subject property's condemnation was not necessarily an abuse of discretion, particularly where the jury was apprised of the circumstances and the appraiser took market trends into account. We do not find the trial court's action in this

---

[3] The State's expert apparently found only one sale in the Lahaina area that he considered sufficiently comparable for valuation purposes, although he considered seven transactions in deriving his opinion on the market value of the subject property. Pioneer's appraiser found it necessary to seek his "comparables" between Lahaina and Napili Bay, a search area over eight miles in length.

regard constituted error; the possible untimeliness of the transaction was a matter affecting the weight of such evidence rather than its admissibility.

### 2.

The State next avers the land exchange between Pioneer and the State in 1973 which was discussed by Mr. Hustace did not qualify as a "comparable." It was not, the State claims, a market transaction involving a willing seller and a willing buyer. Reference to the exchange agreement, it also claims, was misleading and prejudicial because the parties to the transaction were described in the document as "buyer" and "seller." We do not believe the foregoing characterizations of the parties were so misleading as to render the evidence inadmissible. Pioneer's appraiser was cross-examined on this point, and he readily acknowledged the true nature of the agreement. Moreover, the stated values of the exchanged lands, if they were comparable to the subject property under the criteria delineated earlier, were indicia of relevant value. For provisions of the State law governing land exchanges are expressly designed to ensure that the values assigned to exchanged lands are consistent with market value.[4] No abuse of discretion has been demonstrated here.

### 3.

The State also objected to Mr. Hustace's reference to a subsequent sale by Pioneer to the State of part of the land received in the foregoing exchange as a comparable sale. It was not reliable evidence supporting market value, the State contends, because "sales to the condemnor of land earmarked for condemnation . . . 'are almost always in the nature of a compromise.' " *City & County v. International Air Service Co., supra,* 63 Haw. at 328, 628 P.2d at 198 (quoting *Honolulu Redevelopment Agency v. Pun Gun,* 49 Haw. 640, 641, 426 P.2d 324, 325 (1967)). But we have said evidence of a transaction

---

[4] HRS § 171-50, which governs land exchanges made by the State, requires that valuations of the lands to be exchanged be made by a disinterested appraiser. It also subjects the land exchange to legislative scrutiny and possible disapproval.

between a condemnor and a condemnee "should not be automatically excluded as a matter of law." *Honolulu Redevelopment Agency v. Pun Gun, supra,* 49 Haw. at 642, 426 P.2d at 325. If "the price paid was sufficiently voluntary to be a reasonable index of value, or . . . there is a necessity for the evidence because the only sales . . . in the area in recent years have been to the condemnor," there is a valid basis for admitting the evidence. *Id.* at 642, 426 P.2d at 325. There is no indication that the consideration received by Pioneer represented a depressed price. The sale price reflected the value placed on the land by the independent appraiser in the course of the exchange transaction earlier and was therefore a reasonable index of value. And the paucity of sales in pertinent propinquity has been noted. Again, we are unable to discern prejudicial error.

### 4.

We do not find the allegations of error relating to the discussion of a transaction involving land in NBCID and Mr. Hustace's use of summaries of transactions involving hotel and apartment properties during his testimony merit more than summary consideration. There was no error in either regard. We shall, however, cover the propriety of discussing sales of land zoned for hotel and apartment use in the succeeding portion of the opinion.

### C.

We next consider whether the trial court properly admitted testimony and other evidence related to the probability of a future redesignation of the subject property for other than agricultural or single-family residential use.

### 1.

The taken land was under cultivation in sugar cane; its use was restricted to agricultural pursuits and uses accessory thereto by virtue of its classification within the agricultural district under the State Land Use Law. HRS § 205-2. But it was zoned for single-family residential use under the Maui County zoning ordinance. And with a land use district boundary amendment, it could have been de-

veloped for this purpose. The State's expert tacitly acknowledged the probability of such an amendment, for his estimate of fair market value assumed an ultimate development of the subject property for single-family residential use.

Pioneer's appraiser did not share Mr. Burns' view on the highest and best use of the land in question, for Mr. Hustace's opinion in this regard favored the development of a hotel and apartment complex. He derived partial support for his opinion that this type of development was possible from the Maui County General Plan's map for the Lahaina area which indicated hotel and apartment zoning for the condemned land. The State's specific objection to the admission of the map in evidence was that neither the plan nor the map had been formally adopted by the Maui County Council.

The existence of the map and what it portended for land development in the Lahaina area, however, were no secret. While Mr. Burns minimized its influence, he nonetheless acknowledged the document as a factor that could influence informed buyers and sellers. We emphasized at the outset that anything enhancing the value a free market would attach to the taken property, beyond mere speculation or indicia of highly remote values, should be considered by the trier of fact. *City & County v. International Air Service Co., supra,* 63 Haw. at 327, 628 P.2d at 197. Thus, the State's objection to the admission of a document with a likelihood of being considered by informed buyers and sellers on grounds that the County Council had not adopted the general plan was not well-taken. *Cf. City & County v. Market Place, Ltd., supra,* 55 Haw. at 247, 517 P.2d at 22 (testimony on a reasonable probability of rezoning was improperly excluded on ground that "rezoning along this line 'was never adopted.' ").

2.

Further support for Pioneer's position regarding the use of the subject property was provided by the testimony of Mr. Takahashi and Mr. Sodetani covering the reasonable probability of relevant land use district boundary and county zoning ordinance amendments, as well as the testimony of Mr. Hustace and a summary of land use boundary changes approved or denied by the Land Use Commission. The State contends all of the foregoing evidence was

inadmissible for sundry reasons. It further avers Pioneer failed to meet its burden of demonstrating a reasonable probability of a future use of the subject land for other than its permitted use pursuant to the land use district designation then extant.

Fair market value is "the amount of money which a purchaser willing but not obliged to buy the property would pay an owner willing but not obliged to sell it, taking into consideration all uses for which the land was suited and might in reason be applied." 4 NICHOLS', *The Law of Eminent Domain* § 12.2[1], at 12-71 to 81 (3d rev. ed. 1980) (footnotes omitted). Hence, it "is not limited to the value for the use to which the land is actually devoted, . . . [for] it may have a potential use value." *Hawaii Housing Authority v. Rodrigues,* 43 Haw. 195, 197 (1959). This latent value finds expression in the parlance of real estate appraisal as "highest and best use," which is confined neither "to the use at the time of taking" nor "by the zoning at the time of taking, if there is a reasonable possibility that there may be a rezoning." *State v. Midkiff,* 55 Haw. 190, 193, 516 P.2d 1250, 1253 (1973) (quoting *Wolff v. Commonwealth of Puerto Rico,* 341 F.2d 945, 946 (1st Cir. 1965)). A condemnee therefore is generally permitted to advance any reasonable argument for a probable future use; and once such is made, "competent evidence tending to show the value of that use should be admitted." *City & County v. Market Place, Ltd., supra,* 55 Haw. at 243, 517 P.2d at 19-20. We find no reason to disturb the trial court's determinations that Pioneer's argument in this regard was within the realm of reason, not merely speculative,[5] and that Pioneer's witnesses had competent evidence in support thereof.

The witnesses called by Pioneer to lend credence to Mr. Hustace's view on this score professed knowledge of the lore of Maui real estate from first-hand experience. The State produced nothing to negate the claims of Mr. Takahashi, the president of an Amfac company engaged in land development in West Maui, and Mr. Sodetani, a land appraiser and former Chairman of the County Planning Commission, that they were qualified to discuss the

---

[5] The applicable test here is, of course, not the probability of rezoning in absolute terms, but the fair market value of the condemned land in the light of the chances for rezoning as they might appear to the hypothetical willing buyer and willing seller. *See* Wolff v. Commonwealth of Puerto Rico, *supra,* 341 F.2d at 946 n.3.

"chances for rezoning" the subject property. *See* note 5 *supra*. We thus find no basis to overrule the trial court's determination that the evidence they had to offer the jury was relevant, material, and perhaps competent. Nor can we say the summary of Land Use Commission decisions on petitions for district boundary amendments discussed by Mr. Hustace lacked probative value. For it tended to counter Mr. Burns' view and his supporting evidence, an isolated denial of a request for such change.

Although Mr. Burns disagreed with Pioneer's witnesses on potential use value, "[e]xperts' opinions vary and the competence, credibility and weight of their testimony is exclusively the province of the jury." *Territory v. Adelmeyer,* 45 Haw. 144, 163, 363 P.2d 979, 989 (1961). And "[w]here there is conflict as to the highest and best use of the property, the question is properly one left to the jury." *State v. Dillingham Corp.,* 60 Haw. 393, 408, 591 P.2d 1049, 1058 (1979). The jury having spoken on the competence, credibility, and weight of the evidence covering the highest and best use of the condemned property, the State's argument on any burden of proof relative thereto is clearly without merit.

### D.

Further error in admitting evidence consisting of a development concept and plan for Amfac-owned property adjoining the condemned land prepared after the commencement of this eminent domain proceeding, as well as testimony related to the document, is alleged. The evidence, in the State's view, was too remote and speculative. While a development scheme for adjoining lands formulated by the owner subsequent to the filing of a condemnation suit may not constitute the most reliable indicia of the future use of the subject property,[6] it nevertheless provided something more than mere speculation about a reasonably probable future use. We cannot conclude the trial court abused its discretion here.

---

[6] In City & County v. International Air Serv. Co., *supra,* we agreed with the circuit court that two hypothetical development plans formulated after the commencement of suit had a dangerous propensity to confuse the jury and were properly excludable. But there, the record indicated the plans were purely hypothetical and specifically designed to demonstrate maximal use of the land in question. They were exercises in "imagination and ingenuity." 63 Haw. at 336-39, 628 P.2d at 202-04.

The "Kaanapali Land Use Concept" by no means belongs to the genre of hypothetical plans we found properly excludable in *City & County v. International Air Service Co., supra. See* note 6 *supra.* Its proposal for hotel and apartment development on land adjacent to the subject property was consistent with existing uses in the vicinity — hotels and apartment condominiums were already built on neighboring land when the plan was conceived. Where a probable future use is discernible from a present use of nearby lands, evidence premised on the existing use cannot be said to be too remote and speculative or unduly confusing for the jury. *See City & County v. International Air Service Co., supra,* 63 Haw. at 336-39, 628 P.2d at 202-04; *Dash v. State,* 491 P.2d 1069 (Alaska 1971).

### E.

Having decided there was no prejudicial error in the trial court's evidentiary rulings, we direct our attention to the State's assertions of error with respect to the court's instructions to the jury.

Jury instructions, we have said, "must be considered as a whole." *Territory v. Adelmeyer, supra,* 45 Haw. at 156, 363 P.2d at 986. Moreover, "a refusal to give an instruction that correctly states the law is not error if another expressing a substantially similar principle is given." *City & County v. International Air Service Co., supra,* 63 Haw. at 339, 628 P.2d at 204; *State v. Heirs of Kapahi,* 48 Haw. 101, 108, 395 P.2d 932, 937 (1964). After examining the instructions with these precepts in mind, we conclude the jury was properly instructed.

### 1.

The initial assignment of error regarding the instructions covers State's Instruction Nos. 5 and 6 which were refused.

Instruction No. 5 would have specifically advised the jury that the subject land was "to be evaluated in terms of uses permitted under existing Land Use District classification and County zoning regulations, the former overriding the latter"; Instruction No. 6 would have expressly charged Pioneer with the burden of establishing a reasonable probability of a change in permitted use. The requested instructions, of course, did not misstate the law or Pioneer's burden — State primacy in land use is not an arguable

matter and the proponent of a use other than that designated under the Land Use Law for valuation purposes undoubtedly must demonstrate a reasonable probability of a future boundary amendment.

The record, however, reveals the jury was adequately instructed in these regards, though not in the specific terms desired by the State. Instruction No. 7, Defendant's Instruction No. 7 as modified and given over the State's objection, in essence instructed the jury that the weight to be accorded a witness' opinion of value "based in part upon the reasonable probability of a change in zoning in the near future" hinged upon the establishment of such probability.[7]

### 2.

The State then avers the trial court erred by giving Instruction Nos. 15 and 16 over its objections. It claims Instruction No. 15, Defendant's Instruction No. 4 as modified, did not reflect the evidence and Instruction No. 16, Defendant's Instruction No. 5 as modified, contained misleading terminology. These averments are not substantiated by the record.

### a.

The particular objection to Instruction No. 15 is that it included the following sentence:

The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably likely to affect market value.

The trial transcript, however, does not confirm the State's contention that "there was no evidence of combination with other land

---

[7] The instruction stated in part:

A witness may also consider the reasonable probability, if any, of a change in zoning or land classification restrictions in the near future, and the effect such probability would have upon the value of the property. Thus, in weighing the opinion of a witness as to the value of the property based in part upon the reasonable probability of a change in zoning or land classification in the near future, you must determine whether or not the evidence establishes that there is a reasonable probability of such change in the near future.

use," for it reflects testimony that the condemned parcels, 7 and 7A, were part of a larger tract of land held by the Amfac conglomerate and their highest and best use would entail development in conjunction with the larger tract.

### b.

The specific objections to Instruction No. 16, Defendant's Instruction No. 5 as modified, are to its allegedly misleading and confusing phraseology. The instruction stated in part:

> If land is so situated that it is actually available for building purposes, its value for such purposes may be considered even if the land is actually used in agriculture or covered with brush and boulders.

The phrase "[i]f land . . . is actually available for building purposes," the State maintains, could have misled and confused the jury because it appeared to emphasize availability for building as the criterion for determining highest and best use. But instructions are to be read as a whole, and when the instruction in question is read in its entirety, we can only conclude it was neither misleading nor confusing. For the jury was further apprised that highest and best use was not restricted to one permitted by the existing zoning and land use classification "if there is a reasonable probability that there may be a change in zoning or land use classification."

The State also deems the instruction prejudicial because the term "highway realignment" was employed therein without further definition.[8] While a highway realignment project may give rise to special damages in some situations, no issue related to such damages was raised. The use of the term was of no significance, and no prejudicial effect could have ensued from its inclusion in the instruction.

As we have observed no prejudicial error in the trial court's evidentiary rulings and instructions to the jury, "the verdict must stand unless it is plain that it is so excessive as to have been brought

---

[8] Instruction No. 16 read in part:

In determining fair market value, . . . you must disregard the proposed condemnation for highway realignment and must value the land as if the highway realignment did not exist and the condemnation had not occurred.

about by passion or prejudice, or is so excessive as to be shocking to the enlightened conscience." *Territory v. Adelmeyer, supra,* 45 Haw. at 163, 363 P.2d at 990. And as the jury's finding that $4.25 per square foot was the. fair market value of the condemned land does not appear excessive under these standards, we turn to Pioneer's cross-appeal.

### III.

The gravamen of the cross-appeal consists of allegations that the condemnee was not adequately compensated because the trial court denied requests for additional compensation by way of "post-judgment blight of summons interest,"[9] attorneys' fees, costs, and expenses.

The judgment entered by the trial court included the following items: (1) $699,828.25, representing the difference between the jury verdict and the initial deposit in court by the State of $37,454.50 when it took possession of the land; (2) 5% interest on the $699,828.25, as provided by HRS § 101-33,[10] for the period between

---

[9] Blight of summons interest, otherwise referred to as "blight of summons damages" is:

a term which in general means the indemnification due a condemnee for the damages resulting from the government's delay in paying the full cash equivalent of the property taken on the date of summons. There are two basic varieties of blight of summons damages in Hawaii. One arises during the period between the date of order of possession under HRS §§ 101-28 or 29 and the date of final payment of just compensation to the defendant, and consists of interest at the statutory rate of 5% per annum provided in HRS §§ 101-33 and 25 applied during this period to the amount by which the final award of just compensation exceeds the deposit of estimated just compensation upon which the order of possession was based. The other arises during the period between the date of summons and the date of order of possession, and, under *City & County v. Bonded Investment Co., supra,* consists of interest also at a rate of 5% per annum applied during this period to the final award of just compensation.

City & County v. Market Place, Ltd., *supra,* 55 Haw. at 235, 517 P.2d at 15-16 (footnote omitted). .

[10] HRS § 101-33 reads:

Allowance of interest, etc. If an order is made letting the plaintiff into possession as provided for in sections 101-28, 101-29, and 101-32, the final judgment shall include, as part of the just compensation and damages awarded, interest at the rate provided in section 101-25 from the date of the order until paid by the plaintiff; provided, that except in the case of an appeal by the plaintiff as provided

June 17, 1976 when the State gained possession of the land and the date of the deposit of the remainder of the sum awarded, but excluding interest that might otherwise have accrued over periods of approximately seven and one-half months when trial of the case was continued at Pioneer's request; and (3) additional interest of 5% on $699,828.25 in the event the foregoing sums were not deposited within thirty days of the final judgment, as provided by HRS § 101-25.[11] Pioneer subsequently moved for attorneys' fees, costs, and expenses, an award of post-judgment interest, and pre-judgment interest that had been disallowed previously, but all of the requests were denied.

### A.

We first examine the thesis that an additional award of "post-judgment interest on blight of summons damages" is occasioned. Pioneer purports to find support therefor in the language of HRS §§ 101-33 and 101-25 and argues the judgment otherwise would not reflect just compensation. We do not agree, for the argument has been encountered and rejected by this court in a somewhat similar setting.

*State v. Heirs of Kapahi,* 50 Haw. 237, 238-39, 437 P.2d 321, 322 (1968), involved the computation of "interest on the deficient principal under provisions of § 8-31 (now HRS § 101-33)" and the award of "interest under the provisions of § 8-23 (now HRS § 101-25)." As

---

in section 101-32, interest shall not be allowed upon any sum paid by the plaintiff to the clerk of the court from the date of the payment. The court may fix and include in the order or judgment the time within which and the terms upon which the parties in possession shall be required to surrender possession to the plaintiff. The court may make such orders in respect of encumbrances, liens, rentals, taxes, assessments, insurance, and other charges, if any, as shall be just and equitable.

[11] HRS § 101-25, in pertinent part, reads:

Payment of judgment, penalties. The plaintiff shall within two years after final judgment pay the amount assessed as compensation or damages and upon failure so to do all rights which may have been obtained by the judgment shall be lost to the plaintiff; and if such payment is delayed more than thirty days after final judgment, then interest shall be added at the rate of five per cent a year.

In State v. Heirs of Kapahi, *supra,* 50 Haw. at 240, 437 P.2d at 323, we read "final judgment" to mean "the judgment which is entered after the disposition of an appeal to this court."

in this case, the State did not object to the award of interest on deficient principal pursuant to R.L.H. 1955, § 8-31 (now HRS § 101-33). But it disputed the trial court's computation of interest awardable under R.L.H. 1955, § 8-23 (now HRS § 101-25) from the date of the circuit court's judgment, rather than from the entry of judgment after the disposition of the appeal to this court. In disapproving the computational method employed by the circuit court, we said:

> The method of computation of interest advanced by appellees and adopted by the trial court has a compounding effect in that *interest would be paid on a judgment which itself includes interest.*

*State v. Heirs of Kapahi, supra,* 50 Haw. at 239, 437 P.2d at 322 (emphasis added). Since the judgment here likewise included interest on deficient principal, an award of "post-judgment interest on blight of summons damages" would be tantamount, as the State maintains, to an award of "interest on interest." Despite Pioneer's assertions to the contrary, HRS § 101-33 contains no authority for such an award.

## B.

We turn from post-judgment to pre-judgment interest and the contention that a constitutional guarantee of just compensation and HRS § 101-33 were breached by the disallowance of interest for periods the trial was continued at Pioneer's request.[12]

The payment of interest as "blight of summons damages" is designed to indemnify the condemnee "for the damages resulting from the government's delay in paying the full cash equivalent of the property taken on the date of summons." *City & County v. Market Place, Ltd., supra,* 55 Haw. at 235, 517 P.2d at 15. It is premised on "the equitable principle that the owner is entitled to 'just' compensation, which is the full value of the property taken together with damages." *State v. Coney,* 45 Haw. 650, 657, 372 P.2d 348, 352 (1962); *City & County v. Board of Water Supply,* 36 Haw. 348, 350

---

[12] The trial court's attribution of the delays in question to Pioneer is disputed. Our review of the record, however, confirms that the continuances were at Pioneer's requests.

(1943). Given the foregoing purpose and foundation for the allowance of pre-judgment interest on deficient principal, we perceive no abuse of discretion in the trial court's denial of interest for the periods in question. The accrual of interest while a condemnation trial is held in abeyance at the request of a condemnee would grant it recompense where none is due.

Pioneer purports to find further support for its proposition in express statutory language. The applicable statute, it claims, compels the payment of interest on deficient principal "from the date of the order [of possession] until [the judgment is] paid by the plaintiff," except that "interest shall not be allowed upon any sum paid by the plaintiff to the clerk of the court from the date of the payment." HRS § 101-33. There is no room, it says, for the disallowance of interest on deficient principal for any reason since the pertinent statute only excuses the payment of interest on sums deposited in court. While a literal reading of HRS § 101-33 may support Pioneer's thesis, we have not been inclined to read statutes literally where "literalness may strangle meaning." *Hawaii Carpenters' Trust Funds v. Aloe Development Corp.*, 63 Haw. 566, 574, 633 P.2d 1106, 1111 (1981) (quoting *Utah Junk Co. v. Porter*, 328 U.S. 39, 44 (1946)); *State v. Raitz*, 63 Haw. 64, 73, 621 P.2d 352, 359 (1980). The application of HRS § 101-33 suggested by Pioneer would contravene the statute's manifest aim and our notions of equity.

### C.

Having decided that Pioneer was awarded all of the interest it was entitled to, we focus on its final averment of error, the failure of the trial court to include attorneys' fees, costs, and expenses in the judgment.

We ruled in *State v. Davis*, 53 Haw. 582, 586-87, 499 P.2d 663, 667 (1972) (footnote omitted), that a "judgment in an eminent domain proceeding is not to be deemed 'in favor of defendant and against the plaintiff' unless the property sought to be condemned is not finally taken for public use" and that attorneys' fees and expenses "are not embraced within the meaning of 'just compensation.' " But Pioneer argues there is a recognized " 'bad faith exception' to the traditional rule that attorneys' fees may not be recovered in the absence of statute." Thus its plea for attorneys' fees, costs, and

expenses is grounded on allegations of the State's bad faith in depositing a grossly inadequate sum when it took possession of the condemned land. The circuit court, however, found no bad faith on the part of the State; it also deemed *State v. Davis* controlling. We agree that *State v. Davis* is dispositive of the question here. "If an adjustment in the law of eminent domain is dictated by fairness in this connection, it is a matter for consideration and action by the [legislature]." *State v. Davis, supra,* 53 Haw. at 588, 499 P.2d at 668 (quoting *9.88 Acres of Land v. State,* 274 A.2d 139, 140 (Del. 1971)).

The judgment of the circuit court is affirmed.

*Andrew S. O. Lee (Terence S. Yamamoto* with him on the briefs), Deputies Attorney General, for plaintiff-appellant, cross-appellee.

*Robert B. Bunn (Philip J. Leas & Nancy J. Stivers* with him on the briefs; *Cades, Schutte, Fleming & Wright,* of counsel) for defendant-appellee, cross-appellant, Pioneer Mill Co. Ltd.